Okay. Good morning, gentlemen. This is a case of in the commitment of Julian Montanez Montella 120 oh 913 and 120 1172. The panel you have before you is justice Cynthia cab justice Nate house and my myself justice James Fitzgerald Smith. Our normal procedure is the appellant goes first we usually do not interrupt, unless you get way off into a tangent, then, then we join in but usually you give me the 10 to 15 minutes, and then we ask questions, then the appellee with that we do the same. And then the appellant closes. So, with that in mind, you may proceed. Thank you, Your Honor. Ian Barnes for the appellant Julian Montilla, may it please the court, and my colleague from the state to prove that Mr Montilla was a sexually violent person. The state had to prove three things beyond a reasonable doubt, and that was that he has a conviction for a sexually violent offense that he has a mental disorder, and that that mental disorder makes him substantially probable to reoffend. This morning I'd like to focus on that third element, and I'll stand on the briefing as to the remainder of the issues. No rational trier effect could have found proof beyond a reasonable doubt on this element. And we can that the evidence of the four witnesses really bears that out how insufficient the evidence was the state's lone witness Dr Swear admitted freely that he was relying on unsubstantiated untested subjective personal concerns about Mr. Montilla, whereas Mr Montilla is three witnesses who were Dr Arroyo the IDOC evaluator, Dr Levitt, the state's retained expert who was hired to replace Dr Arroyo and Dr Abbott who was Mr Montilla is court appointed evaluator, all looked at objective science they looked at recidivism data to conclude that Mr Montilla is not a sexually violent person. And nevertheless, the trial court sided with Dr Swear, and specifically said, I find Dr Swears opinions are compelling and persuasive. So I thought the best place to start is to look at what Dr Swear had to say. So we can try and figure out what exactly was so compelling about his testimony because I think the answer ultimately is nothing. To begin with, it's undeniable that Dr Swear looked at the objective data, he looked at the science for recidivism statistics, and then discarded it and said that's not good enough that doesn't tell us enough. And what he instead hung his hat on were what he refers to as idiosyncratic risk factors, which for him are factors specifically derived from Mr Montilla's time on parole in 2005, more than 15 years ago. And what he had to say about those factors should be troubling in the context of the high burden that is proof beyond a reasonable doubt. He said, first of all, these factors are not based on any research, any studies, any science, any data that came solely from his own mind. He admitted that there is no way to quantify them, there's no way to say how much risk, these factors carry with them. And he was unable to say how many people in the samples for the actuarial instruments like the static 99 and static 2002 are have engaged in similar behavior, and nevertheless, not reoffended. So what is significant about all that is really that Dr Swear has no earthly idea what the significance of these factors are. They're simply to him and his own personal judgment, enough to get to substantially probable, but he can't articulate at all, how they're significant, why they're significant, whether the instruments themselves are already accounting for this information and he's counting it again. And it's, it's worth noting that, excuse me, in these cases. They're generally pretty routine, the evaluators follow the same pattern they look at the static 99 are they look at the static 2002 are maybe they look at the stable 2007. They look at dynamic empirically derived risk factors that come from specific studies, and then they look at protective factors. But for Dr Swear in this case, he went off the reservation to come up with these quote unquote idiosyncratic factors, because that was all he had. Because the science did not back up the notion that Mr Monte is a sexually violent person, specifically that he has risk that rises to the level of substantially probable. And there's one quote that I think really highlights exactly what was so insufficient about Dr swears testimony on cross examination, he said, I cannot quantify the risk associated with this. I can merely report why I think it's problematic. And that your honors is not proof beyond a reasonable doubt. And we're talking about the highest burden we have in our justice system. Dr sweet you're saying, I cannot quantify this, I don't know how to explain the risk, I only can tell you why I personally think it's problematic is not sufficient, particularly in the context of cases like people versus Murray, and in right a commitment of McCormick, where the Supreme Court and this court, respectively. Really focused on the idea that the expert must be able to provide some sort of connective tissue they have to say what the reasons for their opinion on. And in this case, we have Dr sweet you're saying there is risk, but he can't explain how he gets to that threshold of substantially probable. We have a trial court who accepted the opinion of an expert who not only couldn't explain that gap. But Dr swear freely admitted that the information he's relying on these idiosyncratic factors are incapable of providing that information, because there is no data for them there is no research for them. No one else uses them. They came purely from Dr swear, because he made them up in this case. So I would submit that all on its own, that is reasonable doubt, but especially in the context of the other three witnesses who are all noteworthy for a number of reasons. The first one being that they all opined that Mr Monte is not a sexually violent person. And they each used slightly different methodology to get there. And I would say I would submit that that only reassures us of the existence of reasonable doubt in this case, when each one use a slightly different route to get to the same outcome. But they're also noteworthy because of who they are. Dr Abbott Mr Monte is court appointed expert is of course well qualified in his own right, but the other two experts are noteworthy, because they are two individuals that the state has relied on for years and years and years to help prosecute these cases, Dr Arroyo of course works for Wexford which is in turn, contracted with the Department of Corrections to do these evaluations. He has testified countless times for the state to help detain people in the PDF. Excuse me. And Dr Leavitt is the person that the state turns to when they need a lifeline. When someone renders an opinion that is unfavorable as happened in this case with Dr Arroyo, they turn to Dr Leavitt and say, we need a second opinion. Dr Leavitt came in initially opined that Mr Monte was a sexually violent person, and then later changed his opinion, because the science changed because the data changed. And because he realized or because the methodology changed that would allow him to look at risk factors for Mr Monte that are scored by the stable 2007 and actually get objective information from them, he said, when I first evaluated him. I had to estimate the value of these risk factors, subjectively. And after the methodology was updated after new information became available, and he was able to see what the actual objective data is, he changed his mind. And just broadly speaking, the, the risk estimates. In this case, are, to put it very simply, dramatically low. For people like Mr Monte, for people who are similarly situated to him with his background, his criminal history, his victim profile. The risk estimates for that group are as low as three and a half percent over one year, and as low as 8% over five years. So what that tells us is for people like Mr Monte, even over five years, over 90% of them are not recidivating. And when we're talking about the context of substantially probable which means much more likely than not, which is inherently a question of probability. Being able to say that Mr Monte belongs in this group where the vast majority of people are not recidivating is clearly reasonable doubt, especially when those statistics do not account for the statistics about intrafamilial offenders, which is the category that Mr Monte falls into the testimony was, they have the lowest recidivism, excuse me recidivism rates of any kind of sex offender, and that they recidivate at rates 25 to 50% less than other sex offenders, and the instruments don't account for that. And as Dr Levitt said, the instruments may not be exact, but they're as close as we're going to be able to get and they're informative. So we have three experts, all of whom relied on this objective recidivism data. And they said, based on that, we cannot conclude that he's substantially probable. And then we have Dr Swear, who has gone off the reservation to rely on unsubstantiated unresearched unstudied factors that he came up with to say, I know better than the people who have been analyzing this data for years, who have been gathering it all together, looking at the samples, researching the outcomes, and publishing the data. I know more. And that has to be reasonable doubt. If that standard is to mean anything that has to be reasonable. What the Supreme Court of the United States has said about reasonable doubt is that it's meant to minimize the risk of error to the individual, even at the risk that someone who deserves to be locked up will go free. And what this case represents is basically the inverse principle. This case is filled with reasonable doubt. And yet, here we sit, talking about whether Mr Monte is a sexually violent person. Dr swears opinion really reduced this case to one about emotion. It would be reduced it to one about fear, rather than looking at what the actual objective data represents. And that simply cannot be what we're after when we're talking about the highest burden in our justice system proof beyond a reasonable doubt. So, I would ask this court, and I understand you, you must have questions but I would ask this court to reverse the judgment of the trial court outright, based on a lack of proof beyond reasonable doubt. My first question to you is, you put a lot on Leavitt, but his final evaluation was, he was above average. And that seems to fit in with the trial courts ruling that there's so much inconsistency between the varying witnesses that the only consistent one seemed to be. Dr. Seier, all the others weren't consistent. They're either average, high risk, all of them at some point and Leavitt finally says finally above average. So, you know, when you're dealing with statistics. And then, in addition, the fact that this gentleman did not want to be reevaluated. Doesn't that play well against what you're saying. No, Your Honor, and I have a couple, couple answers to that. The first one is that label above average really doesn't isn't that informative until you look at the objective data that goes with it, because what is above average mean if we're talking about a stable data for what that means and you're saying that that could be anywhere from an 8% chance of recidivism up to I think the highest estimate was somewhere around 13 or 14%. So above average is still when you can, when you have the context of what the objective recidivism statistics are not that high. The above average is simply a label that compares Mr. Montia to other people around him it doesn't give us an objective indication of what his actual risk is. The other point I want to make Your Honor is, you mentioned the experts being inconsistent with one another. And that was something the trial court pointed out. And I think the mistake in that is that reasonable doubt doesn't ask us, are these experts to be pitted against one another. We're supposed to analyze their testimony against the question of, is there a reasonable doubt. And the fact that they used slightly different methods isn't necessarily indicative of anything. For example, Dr. Abbott did not use the stable, and he doesn't use these empirically derived risk factors on the basis that he doesn't believe those provide any better estimate of risk than the static 99 are. And the methodology he used came up with a risk of recidivism of 5.9% over five years, which is right in the ballpark compared to what the baseline static 99 score is, and what some of the lower end stable 2007 recidivism estimates were. So there's really no just on the basis of them using different methods isn't intrinsically a reason to discredit them. That answer your question, Your Honor. Yeah, I'll accept it. Any other questions. Well, just to follow up on Justice Smith's question. So, we have four experts and, and they're each giving somewhat different testimony in the rely on different instrumentality and reaching in making their stating their opinions. So, why isn't this simply the case of you asking us to reweigh the evidence, and to find in favor of Mr. Montoya's three experts, as opposed to the state's expert. I mean we acknowledge that they each have different approaches. Sure. There's two answers that the first one is if we look back to people versus Murray, and the McCormick case which I realize is a rule 23 but we can still talk about it as, as a persuasive opinion because I think it's instructive. The both of those cases come down to not credibility, but simply a lack of evidence. And what I said about Dr Swear was his testimony certainly bore out that Mr Montoya has some risk. But the question is, does his risk, get to the level of substantially probable, and what he provided to the trial court did not include that explanation because he said there's no studies for this, I can't quantify it. I don't know what the samples have to say about it. So he was lacking that ability to actually explain and Murray says that explanation is critical to the state's fundamental burden of proof. The other side of this is that the standard is, could any rational try or effect, find proof beyond a reasonable doubt. And as the the case law bears out that deference to the trial court is not unlimited. And if there's ever a case where we can say we need not defer to this, it would be this case where you have three experts who testified for Mr Montoya, who all grounded their opinions in facts and science and data. When did the incident with the at the Technical College occur. That was 2005. That was 2005. Does that have any bearing at all on this case. I mean, at least as I understand it neither Dr. Arroyo or Dr. Abbott considered that incident in coming to their conclusions. Does that have any bearing on this at all. Well, I think, first of all, Your Honor, I disagree that they, they didn't consider it. If I recall correctly, I know Dr. Abbott and Dr. Levitt and perhaps Dr. Arroyo specifically said I looked for any extraordinary factors that would cause me to override what I was looking what I was seeing in the data. Well, let me let me just interrupt you because you might need to correct me on on the record. So as I understand Dr. Arroyo's testimony, it was, he did not score Montoya on that incident because he perceived that the victims had been family members. And with respect to Dr. Abbott, the testimony, I think was, he didn't consider the incident with the girl at the at the technical and he just didn't consider it. I don't believe it's correct that they didn't consider it at all. I think it's more fair to say that they, they didn't see anything in it, that would cause them to to question the empirical recidivism data that they would that then be a reason for the trial court not to independently have considered it could the trial court have ignored it. Well, I think, and I hope this answers your question. This comes back to how is this information actually being admitted and it's being admitted as basis of opinion not for its truth. So, it's only to be considered. So the trier of fact can evaluate the opinions before it, but simply just considering these facts as true is not something that the trial court is permitted to do with basis of opinion evidence. I think what's, what's critical to remember is when we're looking at this behavior I mean first of all, no offense occurred. And these were things that Mr. Montia was reporting to his parole officer. But beyond that, this really circles back to what Dr. Swear did which is he's considering this stuff. He's very concerned about it he thinks it indicates much higher risk than what the instruments. Otherwise reflect, but there's nothing of substance to back it up there's no data. There's no study that says someone who was on parole and was at a family Thanksgiving and received kisses and hugs from family members is at higher risk to reoffend there's nothing that says that. And there's nothing that says what happened to the technical college is going to support higher risk to reoffend there simply is no data on that. We're only talking about Dr. Swear's own personal opinion. We have to wait until there has been a trial on the merits with respect to an allegation of sexual violence. Before we can include that as a part of the consideration as to whether or not there's the risk to recidivate. We need a trial on the merits that would find beyond a reasonable doubt that the incident with the technical college student, in fact occurred. I don't think any of. I think if I had my way your honor that would be, that would be ideal. I don't think any of the experts would agree with that. I think they would all say that it's okay to consider it. The question is, what objective information do we have to actually conclude that this makes Mr. Montia more risky than what's in the instruments to begin with. And that comes back to the point of Dr. Swear can't say how many people in these samples engaged in similar behavior, and nevertheless did not reoffend because maybe some of the people in the samples did things like this they were at a technical college, or they were at a school or they were wherever and they saw someone, and they had arousing thoughts and didn't reoffend. If that's the case, then to some degree the instruments are accounting for these things. And Dr. Swear can't say whether that's actually the case, but was relying on them anyway. So that is the fundamental problem here that he is taking these things as a guarantee that they increase Mr. Montia's risk, all the way to substantially probable, but he has no actual basis for that. He has no substance to actually undergird that. He's simply assuming that's the case. I have nothing else. But it's going back to the technical college incident. That involved more than just a passing thought about the underage minor. I mean, he made notes about when there are comings and goings, when the parents are not being around. It's almost as if he's planning something. It's more than just, oh, I saw something and had a thought. He actually was scheming and taking note, and I believe one of the doctors said an attack was almost inevitable, given the evidence. Well, I think that goes back to what is fundamentally part of the problem with Dr. Swear's opinion, because what he said was very different, and he freely admitted this, was very different from what the documents actually said. Dr. Swear made comments like Mr. Montia was monitoring this girl. He was identifying times when she was alone. And when I cross-examined him, he admitted very openly that those were his words. Those were not the words used by the parole officer. And what the parole officer had noted was that Mr. Montia was working there. There were a couple parents who were attending the school. They had their daughter there with them, and he had noticed times when she was alone. There wasn't any testimony that this was in response to a question or whether this was freely volunteered information, but there's a very distinct difference between Mr. Montia transparently telling his parole officer, there's a 12-year-old girl there, I'm attracted to her, I've noticed when she's alone, versus him monitoring her and identifying times when she's alone. Those have very different connotations. One of those was grounded in the actual parole documents. One of those was Dr. Swear's editorializations, which lets me come full circle to this idea of Dr. Swear didn't have science on his side, but what he did have was some of these scary ideas that he really doubled down on and editorialized and used that to appeal to emotion and appeal to fear. So I really, I guess I disagree, Your Honor, with the ultimate characterization of what Mr. Montia was doing, especially given Dr. Swear's admissions on cross-examination that he was really editorializing this information pretty heavily. I don't have anything else. Joshua, you may proceed. Thank you, Your Honor. May it please the court, counsel, I'm Assistant Attorney General Josh Schneider on behalf of the people of the state of Illinois. I will follow able counsel's lead and focus my arguments on the question of substantial probability to engage in acts of sexual violence and address any questions the court may have about the conditions or the other. The fact of the previous conviction for sexually violent offense and the mental disorder question if the court has any questions. I want to start with a point that was raised in response to Justice Cobb's question that, of course, the question is not was there reasonable doubt. On sufficiency review, the question is, in the light most favorable to the people of the state of Illinois, viewing all of the evidence in that light, drawing all reasonable inferences in the people's favor, could a rational fact finder have found that there was no reasonable doubt. And that is a, an important distinction, because of course, baked into the review of evidence is the fact finders credibility determinations and as Justice Cobb noted in her question, this court is not free to simply substitute its own credibility determinations for those of the fact finder below. So what we need to do is look at the evidence and say, does this provide a basis for Dr swears opinion that is not so incredible that no rational fact finder could have accepted it, and the evidence here plainly meets that standard respondent has argued. Primarily that Dr swears opinion could not be credited because it ultimately did not rest on science, he says there was no studies, supporting this conclusion that the idiosyncratic and empirical risk factors suffice to elevate the actuarial baseline risk above substantial probability. But it cannot be that the only evidence that is sufficient to prove an SVP is risk of recidivism is actuarial studies, because as Dr Levitt testified below the actuarial baseline at the highest is only 40%. So, what elevates any SVP is risk of recidivism above less likely than not too much more likely than not, is always going to be the evaluating experts exercise a professional judgment, and that that's why we have experts if it was just a question of number It wouldn't actually need an expert to opine as to how the various risk factors, in his opinion, raise the risk above the statutory threshold. So here Dr Swear conducted an act and adjusted actuarial risk analysis he started with the static 99 are the static 2002 are an actuarial baseline, but he said that is not sufficient to get an actual accurate understanding of what any particular sex offenders risk of recidivism is because those two actuarial instruments have substantial flaws that caused them to underestimate the risk of recidivism. First is that they're temporarily constrained, they only go out to five years, so the statute, the SVP act does not limit itself to the risk of engaging in acts of sexual violence, only within a five year period. The second problem with the actuarial instruments, is that they evaluate recidivism, based on new charges within that five year period, and new convictions within that five year period, and so for that reason they also underestimate risk because of course, a substantial number of sexual offenses are not identified much detected rather much less criminally prosecuted at all, much less within a given five year period. So Dr Swear, and Dr Leavitt for that matter, started with that actuarial baseline and then exercise the professional judgment, considering additional factors that are relevant to risk. One set of those factors are the empirical dynamic and protective risk factors, risk factors that have had studies, demonstrating that they have particular correlation with increased risk, Dr. Leavitt identified a number of those. For example, the limited capacity for relationship stability, relationships with adults. This was also noted in Dr. Swear's study in his written evaluation where he was discussing respondents progress and treatment, I believe in IDOC, respondent has difficulty forming stable relations with adults, he's not comfortable having a relationship with adults, and that causes him to seek out relationships with children, similar dynamic risk factors that Dr Leavitt identified were emotional identification with children, impulsivity, sexual preoccupation with children. Sex is a coping mechanism to cope with underlying stresses and problems which is what we saw manifest in that 2005 probation incident where respondent told his parole officer, I am under a lot of stress and I'm, I think I'm going to reoffend. I've been been watching this child who's been brought to the school with her, with her parents. I've been noticing when she's when and where she's alone, where she's likely to be. So, there's ample support for why these particular risk factors are the sorts of risk factors that Dr. Swear could have reasonably found elevated respondents risk above the actuarial baseline. Dr. Swear also considered what he called idiosyncratic risk factors, which are risk factors that are not. There's not been studies on them, but that are still factors that that he opined served or that experts recognize serve to further elevate risk so one of the ones that kept coming up as an example, not actually present here. But an example is a stated intent to reoffend. If a sex offender says, if you release me I will sexually assault children. It may be that there is no study, saying that an intent to reinvent elevates risk, but that doesn't mean that it's unreasonable or or arbitrary or incredible for an expert to rely on those sorts of factors as relevant to elevated risk. Here are the idiosyncratic risk factor that Dr. Swear relied upon was this 2005, or was rather illustrated by this 2005 parole incident. First, it showed that respondent was placing himself in high risk situations meaning situations where he is very likely to reoffend. In this case, he was was keeping track of this 10 to 12 year old girl who's at this technical college. Another incident during parole. He went to a family gathering, where he accepted hugs and kisses from from young children. And the other idiosyncratic risk factor was respondents inability to recognize that risk. He had said that he didn't see any need to avoid children. He had said that he didn't see any need for sex offender treatment. He felt that his, his religion, his religious faith would prevent him from having any sorts of problems. And he didn't. He saw his risk of defending as zero. And that lack of insight, combined with his, his demonstrated history of placing himself in high risk situations Dr Swear found was an aggravating factor that elevated his risk that combined with lack of advanced age of beyond 60 years old, or some sort of debilitating medical condition Dr Swear found that though the totality of those circumstances and his professional judgment elevated the risk above substantial probability. And that is not incredible as a matter of law, a rational fact finder could review that opinion. In light of the basis that was provided for it and find that opinion credible. The argument that will these other experts, a person could have credited them as well that is expressly beyond the scope of sufficiency review that is simply asking this court to reweigh the credibility determinations made by the fact finder below. And the fact that Dr Swear provided a basis and an explanation for his risk assessment is why the Illinois Supreme Court's decision in Murray's in a posit as this court recognizing in Moody in Murray. The, the expert, simply opined that the Latin kings was a street gang based on personal familiarity did not provide any explanation as to how the Latin kings met the statutory elements of being a street gang within the definition of the statute. So in the SVP context that would be the equivalent of Dr Swear rolling into court, being asked is respondent SVP and saying, I reviewed these documents, and in my opinion, my opinion is yes he is full stop. No further explanation, obviously the record here is far more developed than that. Dr Swear explained not only the materials that you relied upon and reaching his, his conclusions, but the analytical process that he employed in reaching that conclusion. He said that he he's the explained in detail this adjusted actuarial approach, he explained his starting point at the actual baseline factors he considered to us to raise it above that baseline and why he ultimately concluded that it was above the statutory threshold. And so in the light most favorable to the prosecutor rather to the people in this case, the evidence was sufficient to prove beyond a reasonable doubt that respondent is an SVP questions. I have none. All right. Light of that. Yeah.  Thank you, Your Honor. The first point I want to make is regarding counsel's argument that the SVP act is not temporarily constrained, and I would vehemently disagree with that, based on what is in the plain language of the act. That third element reads. The state has to prove that Mr. Montoya is dangerous, because a mental disorder makes him substantially probable to engage in acts of sexual violence is his present tense we're talking about what is his risk. Now, and to expand this out to say what is his risk going to be from now until an indefinite point in the future is to essentially layer. More uncertainty and probability on a question that is already a question of probability. And that's simply not consistent with what the SVP act requires. And another just, I guess, global problem with the state's argument is there is a distinction between whether a person has some risk, and whether they are substantially probable. I don't know that anyone in this case disputes that there is some risk here. But some risk is not enough to deprive someone of their liberty it's not enough to detain them in the TDF, and it's not enough for proof beyond a reasonable doubt that has to rise to the level of the risk has to rise to the level of substantially probable which is much more likely than not. And I noted that my colleague mentioned that the testimony was the Mr Monte was placing himself in high risk situations. And that really brings me back to this idea of high risk, according to who, because Dr sweeter certainly said it was high risk. But how is he actually arriving at that conclusion that this behavior was high risk, because there aren't any studies to go along with it there aren't any isn't any data to support it. It's simply his own personal opinion that this is high risk. And as I said earlier, he wasn't able to say whether this behavior is something that actually does fall out of fall outside of what would be contemplated by the instruments. And it's important to remember that while the static 99 and the static 2002 are looking at static factors. The stable 2007 is incorporating what the experts have previously talked about being the empirically derived risk factors where studies have shown some sort of correlation between these things. So it's not as though the instruments that Dr sweeter and Dr Leavitt and Dr Royal looked at were completely blind to any sort of risk factors. And one. So I guess the problem with what the state has argued is that, just like Dr sweeter they are assuming statistical significance belongs to this behavior, when nothing in the record actually supports that there is nothing in the record to support that what Mr Montoya did on parole has any statistical significance beyond what the instruments say because Dr swear freely admitted I can't quantify this there's no data for it. And I noted that my colleague when talking about Murray said the problem with that case was the witness said the Latin kings are a street gang based on his personal familiarity with the gang. And that is essentially what has happened here as well. Dr swear has no research, no data to back up anything he's talking about with respect to these idiosyncratic factors, but they are based on his own personal subjective judgment that he believes these things to be so risky that they elevate Mr Montoya to the level of substantially probable. And as my colleague said, when talking about the, the instruments, and why do we need experts. We need experts because they have specialized professional knowledge, and what Dr swear introduced here was not specialized knowledge, it was him looking at Mr Montoya behavior, based on documents and saying, I believe this in my heart of hearts to be And we have three other witnesses who are all grounding their opinions in this objective data. And there's no reason to think that the objective data doesn't represent Mr Montoya. When we're talking about these extra idiosyncratic factors. And the last one I want to make is. Yes, the standard is the light most favorable to the state. And this court isn't supposed to retry this case. But as I said, that deference is not unlimited. There must be some examination of whether this evidence was sufficient. And I would submit that on the record before this court, it was not. So I would ask this court to reverse the judgment of the circuit court, unless your honors have any additional questions. Questions, I do have maybe two, three out of four experts diagnosed Mr Montoya at with pedophilia. Is that correct. Yes, I believe that's correct. Would that not be an indicator in light of the fact that he also allegedly did not complete SVV treatment in 15 years. Are we to or is the trial court to overlook that in light of the absence of statistical data to indicate the rate or the percentage or the rate of likelihood to recidivate. Well, the, the presence of a diagnosis is certainly a different question from whether his risk rises to the level of substantially probable, particularly and I, I may be mistaken, sometimes these cases run together a little bit but I'm fairly certain that at least one witness testified that just because someone has a diagnosis doesn't necessarily say anything about their likelihood of reoffending how risky they are. And you can have that diagnosis, without actually committing an offense. You can have pedophilic disorder and not actually commit an offense, as long as it's causing you distress or some sort of disturbance that diagnosis can exist. So no I don't think the existence of the diagnosis really weighs on the risk element. And likewise, the SVP act does not require treatment. It does not require treatment to be found not SVP. And to go one step further, if someone says, this person has treatment needs, this person could benefit from treatment that goes back to this overarching question of the distinction between some risk and risk that rises to the level of substantially probable, just because someone can benefit from treatment doesn't mean they have to be locked up in the PDF, and more explicitly, it doesn't mean they can be locked up in the PDF. It has to be risk that rises to the level of substantially probable. And then what one final thing on conditional release. Is it true that Mr. Monty is stipulated that he was not ready for release. He stipulated Your Honor to the revocation of his conditional release, but not that he wasn't ready. Is that what you're stating. Your Honor is really testing my memory. I am intense of the stipulation I apologize I don't remember exactly what the contents were. We'll redo it as well. I believe there was some stipulation as to some statements he made I, I do not recall exactly what that's fine. Thank you. That's all right. Thank you. Thank you. Any further questions. All right, thank you both. This is a different field than we normally deal with. So, what was interesting is your in depth explanations of not just what was in the records or the briefs, but how you explained it and we appreciate that very much, because this is a difficult area. So again, thank you very much for both of you for your presentations.